THE ST. LOUIS & SAN FRANCISCO RAILWAY CO. v.
D. E. TRIBBEY.

No. 191.

1. LIVE-STOCK CONTRACT—*rules at top of contract form no part of contract.* Where a railroad company prints rules and regulations for the transportation of live stock, at the top of a sheet of paper on which is printed the live-stock contract, and in the contract refers to the rules and regulations as follows: "That whereas the said St. Louis & San Francisco Railway Company as aforesaid transports live stock only as per above rules and regulations," *held,* that the rules and regulations form no part of the contract.

2. CARRIER'S COMMON-LAW LIABILITY—*cannot be changed by contract, except in accordance with regulations of Board of Railroad Commissioners.* A provision of a contract made by a railroad company with a shipper to transport stock or other property from one point to another in this State, that changes or limits the common-law liability of the company as a common carrier, except when made as provided by regulation or order of the Board of Railroad Commissioners, is void.

3. —— *for gross and culpable negligence not limited by contract.* A common carrier cannot by contract limit its liability resulting from the gross and culpable negligence of its servants and employees.

Error from Wilson District Court. Hon. L. Stillwell, Judge. Opinion filed October 16, 1897. *Affirmed.*

468        RAILWAY CO. v. TRIBBEY.

| S. Dept. | Opinion.   Schoonover, J. | 6 Kan. App. |

*J. W. Gleed* and *C. Hamilton*, for plaintiff in error.
*S. C. Reed*, for defendant in error.

SCHOONOVER, J.  Plaintiff below, D. E. Tribbey, alleged in his petition that on the fourteenth day of August, 1892, through his agent, William Sherlock, he shipped over the defendant's line of railroad from Fredonia to Pittsburg, Kan., a thoroughbred trotting horse ; that the horse was delivered to the Railroad Company to be transported from Fredonia to Pittsburg, and that plaintiff paid the charges for such transportation ; that the horse was loaded in a car with five others and the car attached to a train, which, through the negligent management of the employees of the Railroad Company, on entering the railroad yards at Columbus, Kan., ran into and collided with another train belonging to the defendant, with the result that the thoroughbred horse of plaintiff below was violently thrown down and injured ; that he was so bruised and stiffened as to render him valueless as a trotting horse.

It is further alleged by plaintiff below that when the car reached Pittsburg, Sherlock, the agent of the plaintiff below, before unloading the horse, informed the agent of the Railroad Company that his trotting horse had been injured and damaged in the collision, and that the agent employed a veterinary surgeon to examine the horse, authorized Sherlock to unload all of said stock, and waived service of written notice of said injury.

The defendant answered that the horses were shipped under a written agreement with Sherlock ; that the contract was a special and limited contract, and the sum of $26.75, the rate charged, was a special

freight rate, lower than the regular freight rate of said Company for carrying horses exceeding in value the sum of one hundred dollars ; that in consideration of said reduced rate Sherlock accepted all of the provisions of said contract.

A copy of the contract, attached to the answer, is as follows :

" Live stock, L. C. L., of all kinds, at the following estimated weights : One horse ( gelding or mare ) or pony, mule or horned animal, 2,000 lbs. ; two animals, 3,500 lbs. ; three, 5,000 lbs. ; each additional animal, 1,000 lbs. Bulls, 2,000 lbs. each. Burros, 750 lbs. each. Calves (under 1 year), 500 lbs. each. Colts (under 1 year), 750 lbs. each. Cow and calf together, 2,500 lbs. Goats in crates, estimated weight 200 lbs. each. Hogs, actual weight. Mare and colt (colt under 1 year) together, 2,500 lbs. ; each additional colt (under 1 year old), 500 lbs. Sheep, 200 lbs. each. Stallions or jacks, 3,000 lbs. each.

" In case the owner or consignee agrees to save the St. Louis & San Francisco Railway Company from its liability for any or all of the causes enumerated in the following contract, and also agrees to load, unload, feed, water and attend to the stock himself, etc., as specified therein, the special rates of tariff based on such contract, will be given.

" The said St. Louis & San Francisco Railway Company, as aforesaid, will not assume any liability in excess of the following valuation by shippers : Each horse or pony ( gelding, mare or stallion ), mule or jack, $100 ; each ox or bull, $50 ; each cow, $30 ; each calf, $10 ; each hog, $10 ; each sheep or goat, $3.

" Where the declared value exceeds the above, an addition of 25 per cent. will be made to the rate for each 100 per cent. or fraction thereof of additional declared valuation per head. Animals exceeding in value $800 per head will be taken only by special arrangement.

" For the purpose of taking care of stock, the owner or men in charge will be passed on the train with it, and all persons thus passed are at their own risk of

470        RAILWAY CO. v. TRIBBEY.

S. Dept.            Opinion.  Schoonover, J.        6 Kan. App.

any personal injury from any cause whatever, and must sign release to that effect indorsed on contract.

## " ORIGINAL LIVE-STOCK CONTRACT.

FREDONIA STATION, Aug. 14, 1892.

" This agreement, made between the St. Louis & San Francisco Rly. Co., of the first part, and William Sherlock, of the second part, witnesseth : That whereas, the said St. Louis & San Francisco Rly. Co., as aforesaid, transports live stock only as per above rules and regulations, now, in consideration that the said party of the first part will transport for the party of the second part ——— car-loads of horses to Pittsburg, Kan., station, at the rate of $26.75 per car-load, the same being a special rate, lower than the regular rates mentioned in their tariff, the said party of the second part hereby releases said party of the first part from the liability of a common carrier in the transportation of said stock, and agrees that such liability shall be only that of a private carrier for hire, and from any liability for any delay in shipping said stock after the delivery thereof to the agent of said party of the first part, or for any delay in receiving the same after being tendered to said agent.

"And said party of the second part hereby accepts for such transportation, the cars provided by said first party and used for the shipment of said stock, and hereby assumes all risk of injury which the animals or either of them may receive in consequence of any of them being wild, unruly or weak, or maiming each other or themselves, or in consequence of heat and suffocation or other ill effects of being crowded in the cars, or on account of being injured by the burning of hay, straw, or other material used by the owner for feeding the stock or otherwise, and all risk of damage which may be sustained by reason of any delay in such transportation, and all risk of escape or robbery of any portion of said stock, or loss or damage from any other cause or thing, not resulting from the wilful negligence of the agents of the party of the first part.

"And said party of the second part further agrees,

that he will load, unload, and reload said stock at his own risk, and feed, water and attend to the same at his own expense and risk, while it is in the stock yards of the party of the first part awaiting shipment, and while on the cars, or at feeding or transfer points, or where it may be unloaded for any purpose.

"And it is further agreed, that said party of the second part will see that said stock is securely placed in the cars furnished, and that the cars are safely and properly fastened so as to prevent the escape of said stock therefrom.

"And it is further agreed, that in case the said party of the first part shall furnish laborers to assist in loading and unloading said stock at any point, they shall be subject to the orders and deemed the employees of the said party of the second part while so assisting.

"And for the consideration before mentioned, said party of the second part further agrees, that as a *condition precedent* to his right to recover any damages for any loss or injury to said stock, he will give notice in writing of his claim therefor to some officer of said party of the first part, or its nearest station agent, before said stock is removed from the place of destination above mentioned, or from the place of delivery of the same to said party of the second part, and before such stock is mingled with other stock.

"This contract does not entitle the holder or any other parties to ride in the cars of any train, except the train in which his stock, referred to herein, is drawn or taken. Neither does it entitle him (and the party of the second part named in this contract so expressly stipulates, admits and agrees) to return passage from Pittsburg to Fredonia unless the said contract is presented within the time specified in rule 6 on back hereof. Nor does it entitle any person except the party of the second part and parties who accompany him in charge of said stock for the purpose of assisting him in taking care of the same, as specified in and upon this contract (and does not include women, infants, or other persons unable to do and perform the services required, as expressed in this contract), to such return passage; the object, pur-

472 RAILWAY CO. v. TRIBBEY.

S. Dept.          Opinion.   Schoonover, J.          6 Kan. App.

pose and intent of the return pass being to enable said party of the second part hereto, or his men in charge as expressed in contract, and no other person to return to Fredonia thereon, at any time within number of days specified in rule 6 on back hereof.

"And it is further stipulated and agreed between the parties hereto, that in case the live stock mentioned herein is to be transported over the road or roads of any other railroad company, the said party of the first part shall be released from liability of every kind, after said live stock shall have left its road; and the party of the second part hereby so expressly stipulates and agrees; the understanding of both parties hereto being that the party of the first part shall not be held or deemed liable for anything beyond the line of the St. Louis & San Francisco Rly. Co., except to protect the through rate of freight named herein.

"The evidence that the said party of the second part, after a full understanding thereof, assents to all the conditions of the foregoing contract, is his signature thereto.          J   D. LINGENFELTER, *Agent.*

                              WM. SHERLOCK, *Shipper.*

"Witness: J. W. LINGENFELTER."

Plaintiff below in his reply acknowledged the execution of the contract by Sherlock as agent of the plaintiff, but averred that when the contract was executed Sherlock notified the defendant that the horses which he desired to ship were valuable trotting horses, and were being shipped to Pittsburg for the purpose of starting in the races at that point; that Sherlock asked defendant's agent the freight rate or the price of a car for the transportation of the horses from Fredonia to Pittsburg, and was informed that it would be $26.75, which amount he paid; that he was thereupon requested to sign the contract; that he did not read the contract and did not know that there were any conditions in said contract limiting the responsibility of the defendant; that he was offered no option or

privilege in the amount which he should pay for the transportation of said horses, but was charged the usual and customory price, and was compelled to sign the contract in order to get transportation; that the defendant knew that said horses largely exceeded in value one hundred dollars per head, but fraudulently concealed from said plaintiff the rules of said Company regarding the liability of the Company in case of injury.

The case was tried in the District Court of Wilson County, on the fifteenth day of February, 1893. By agreement of the parties, two special questions were submitted to the jury and the general findings were left to the court.

The questions submitted to the jury were as to the market value of the horse immediately before and immediately after he received the injury. The jury found that the horse was worth nine hundred dollars immediately before, and four hundred dollars immediately after, the injury. The court made the following special findings of fact and conclusions of law:

### FINDINGS OF FACT.

"The pleadings admit that on the fourteenth day of August, 1892, the plaintiff, by one William Sherlock, his agent, entered into a written contract with the defendant for the carriage of his horse from Fredonia, Kan., to Pittsburg, Kan., a true copy of which contract is attached to defendant's answer, marked 'A,' and the same is referred to and made a part of these special findings.

"And from the evidence introduced on the trial I find the following additional facts:

"1. Plaintiff's agent signed the aforesaid written contract on the evening of August 14. It was executed in duplicate, and one copy was delivered to said agent on said evening, and he put it in his pocket. He never read it. He could read and write. The

474    RAILWAY CO. V. TRIBBEY.

S. Dept.        Opinion.  Schoonover, J.        6 Kan. App.

agent of the defendant Company did not specially inform him that the Company would not be liable beyond any particular sum in the event the horses should be injured, nor did said plaintiff's agent know that any such limitation was in the contract he signed, further than may be inferred from the fact that he signed the contract and a duplicate was delivered to him.  Said plaintiff's agent did not inform said defendant's agent as to the value of said horse, but defendant's agent knew that it was a race horse.

'' 2.  Said horse — with other horses that belonged to plaintiff's agent personally — was loaded on a car of defendant's early the following morning, August 15, and early in the day the train conveying said horses left Fredonia for its destination.

'' 3.  Some time between ten and eleven o'clock in the forenoon of said day, the train carrying plaintiff's horse entered the city of Columbus, in Cherokee County, Kansas.  The train on its way had been passing through the cities and villages on the road without stopping, and it was so passing through Columbus. It was running at the time at a speed of somewhere from ten to thirteen miles an hour.  While so running through Columbus, and going in an easterly direction, it collided with great force and violence with another freight train on defendant's road, which was on the main track and headed in a westerly direction. The shock of the collision smashed the cowcatchers of both engines, disabled said engines, threw some of the cars of the train going east off the track, and threw plaintiff's horse violently against the rear of the car in which he was being transported, and injured him.

'' 4.  Owing to this wreck, the train did not arrive at Pittsburg until some time during the night of the fifteenth.  The station agent of the defendant at said place had been informed during the day, by telegram from a superior officer, of the aforesaid collision, and he came to the train that night and looked at the horses that had been injured, including the plaintiff's, and said station agent was fully informed and advised as regards the alleged injuries to said horse, before it

was removed from its said place of destination.    After-
wards and before the commencement of this action,
plaintiff served notice in writing on the defendant of
his claim for damages on account of the alleged in-
juries to said horse.

"5.  I find that the collision of the train before men-
tioned and the consequent injury of the plaintiff's
horse, were caused by the gross and culpable negli-
gence of the servants and employees of the defendant,
in managing and operating the train on which plain-
tiff's horse was being transported."

### CONCLUSION OF LAW.

"And from the foregoing findings, and the answers
returned by the jury to the particular questions of
fact submitted to them, I deduce the following con-
clusion of law : The plaintiff is entitled to recover of
the defendant the sum of five hundred dollars."

The defendant below brings the case here for review
and asserts that there is error in the record, as follows :
*First*, in the admission of evidence as to value ; *second*,
in the court's conclusions of law upon the facts as
found by the court and jury ; *third*, in overruling the
motion of the plaintiff in error for a new trial.

It will be observed from the findings that the value
of the horse shipped was never agreed upon.   The
only reference to the value is contained
1. Rules not p irt of
   contract.   in the rules and regulations for the
transportation of live stock, appearing at the top of
the sheet of paper on which is the printed contract.
The only reference to the rules and regulations for
the transportation of live stock, in the contract, is as
follows :  "That whereas the said St. Louis & San
Francisco Rly. Co., as aforesaid, transports live stock
only as per above rules and regulations."   This state-
ment is not sufficient to justify this court in holding
that the rules and regulations form a part of the con-
tract.  They do not.  Nor can we say that the shipper

476     RAILWAY CO. v. TRIBBEY.

S. Dept.       Opinion. Schoonover, J.       6 Kan. App.

by his silence in any way assented to them. In this conclusion we are supported by high authority. In the case of *Ormsby v. U. P. Rly. Co.* (4 Fed. Rep. 711), McCrary, J., says :

"There is appended to this contract a printed statement, which is headed 'Rules and Regulations for the Transportation of Live Stock,' and in that statement there is a provision that in case damages occur in the transportion of live stock, for which the company may be liable, the value at the place and date of shipment shall govern the settlement, in which the amount claimed shall not exceed $200 for a stallion ; $100 for a horse ; mule, $65 ; cattle, $50, and other animals, $20. And also another provision, that blooded animals, or animals deemed especially valuable, will be carried only on special contract, and agents are not allowed to receive and ship such animals until a proper contract is made between the owner or consignee and the general freight agent. That, gentlemen, is not in the contract which the plaintiff signed. It is in a print which is on the same sheet of paper with the contract. It has been held by the Supreme Court of the United States that the shipper is only bound by the stipulation contained in the contract itself ; or, in other words, that the railway company that proposes to exempt itself from any of its obligations as a common carrier, cannot do it by mere notice, or by printing which is appended to or indorsed upon the contract which is executed, but must do it, in so far as it is lawful to do it at all, by a stipulation in the body of the instrument, to which the shipper assents by his signature."

In the case of *Railroad Company v. Manufacturing Company* (16 Wall 318), the following receipt and notice were considered :

"MICHIGAN CENTRAL RAILROAD COMPANY.
JACKSON, October 11, 1865.
"Received from V. M. Bostwick, as consignor, the articles marked, numbered, and weighing as follows : [Wool described] To be transported over said rail-

RAILWAY CO. v. TRIBBEY.          477

Oct. 16, 1897.        Opinion.  Schoonover, J.          E. Div.

road to the depot in Detroit, and there to be delivered to —— ——, agent, or order, upon the payment of the charges thereon, and subject to the rules and regulations established by the company, a part of which notice is given on the back hereof.   This receipt is not transferable.            HASTINGS, *Freight Agent.*"

· The notice on the back was as follows :

. "The company will not be responsible for damages occasioned by delays from storms, accidents, or other causes, . . . and all goods and merchandise will be at the risk of the owners thereof while in the company's warehouse, except such loss or injury as may arise from the negligence of the agents of the company."

Mr. Justice Davis in delivering the opinion of the court said :

"These considerations against the relaxation of the common-law responsibility by public advertisements, apply with equal force to notices having the same object, attached to receipts given by carriers on taking the property of those who employ them into their possession for transportation.   Both are attempts to obtain, by indirection, exemption from burdens imposed in the interests of trade upon this particular business.   It is not only against the policy of the law, but a serious injury to commerce to allow the carrier to say that the shipper of merchandise assents to the terms proposed in a notice, whether it be general to the public or special to a particular person, merely because he does not expressly dissent from them.   If the parties were on an equality in their dealings with each other there might be some show of reason for assuming acquiescence from silence, but in the nature of the case this equality does not exist, and, therefore, every intendment should be made in favor of the shipper when he takes a receipt for his property, with restrictive conditions annexed, and says nothing, that he intends to rely upon the law for the security of his rights.

"It can readily be seen, if the carrier can reduce his liability in the way proposed, he can transact business on any terms he chooses to prescribe. The shipper, as a general thing, is not in a condition to contend with him as to terms, nor to wait the result of an action at law in case of refusal to carry unconditionally. Indeed such an action is seldom resorted to, on account of the inability of the shipper to delay sending his goods forward. The law, in conceding to carriers the ability to obtain any reasonable qualification of their responsibility by express contract, has gone as far in this direction as public policy will allow. To relax still further the strict rules of common law applicable to them, by presuming acquiescence in the conditions on which they propose to carry freight when they have no right to impose them, would, in our opinion, work great harm to the business community.

"The weight of authority is against the validity of the kind of notices we have been considering. And many of the courts that have upheld them have done so with reluctance, but felt themselves bound by previous decisions. Still they have been continued, and this persistence has provoked legislation in Michigan, where this contract of carriage was made, and the plaintiffs in error have their existence. By an act of the legislature passed after the loss in this case occurred, it is declared 'that no railroad company shall be permitted to change or limit its common-law liability as a common carrier by any contract or in any other manner, except by a written contract, none of which shall be printed, which shall be signed by the owner or shipper of the goods to be carried.' It is fair to infer that this kind of legislation will not be confined to Michigan, if carriers continue to claim exemption from the common-law liability through the medium of notices like the one presented in defense of this suit."

Following the example of Michigan, and, no doubt for similar reasons, the Legislature of our State in 1883 declared: "No railroad company shall be per-

**2. Liability not changed by contract.** mitted, except as otherwise provided by regulation or order of the board, to change or limit its common-law liability as a common carrier.'' § 13, ch. 124, Laws of 1883; ¶ 1336, Gen. Stat. 1889. This plain declaration by the Legislature is an affirmation of the common-law liability of carriers in this State, and courts of review will not relax the rule. The contract set up as a defense in this action, considered as a whole, attempts to release the Company from all liability not resulting from the wilful negligence of its agents. A provision in a contract made by a railroad company with a shipper to transport stock from one point to another in this State, that changes or limits the common-law liability of the Company as a common carrier, except as provided by regulation or order of the Board of Railroad Commissioners, is void.

This case must be affirmed for the further reason the trial court found that '' the consequent injury to

**3. Gross negligence not changed by contract.** the plaintiff's horse was caused by the gross and culpable negligence of the servants and employees of the defendant, in managing and operating the train on which plaintiff's horse was being transported.''

This finding is fully supported by the evidence. The rule that a common carrier cannot contract for exemption from the consequences of his own or his agent's negligence, is supported by the greater weight of authority. See *K. C. St. J. & C. B. Rld. Co. v. Simpson*, 30 Kan. 645, and cases there cited. No court of final decision has ever held that a common carrier can by contract limit its liability resulting from the gross and culpable negligence of its servants and employees.

The judgment of the District Court will be affirmed.